Bella Vista's Blanket Hey, police, the court, Clinton Hubbard, you're in for a call from Westar Revider Aid. This matter is before the court from the board of the ASPCA. There were two separate issues, two separate matters. One was called the Air Start Claim, ASPCA 52827. And the other two called the Elimination Claim, ASPCA 53171. There are no overlapping issues or facts, so we've got two separate matters here. And if the panel has any questions of a particular interest, I might help expedite it, since we're trying to cram two separate appeals into one session. I'll start with briefly the Elimination Claim. That is a substantial evidence appeal. We are questioning the findings of the fact by the board. Normally that's a higher verb, a difficult verb. In this case, we think the board overlooked there were six key facts. They simply overlooked that. And if the panel has any questions about that, we'd be willing to address that. It seems to me that part of the specifications here were quite clear as to requirements for the elimination of the matter, quite clear with respect to the materials that were to be used and how they were to be applied and whether they should be permitted to dry or not dry and how long they should be permitted before the final concrete was poured. And I don't know what it is. It's difficult for me, reading the record, to conclude that the board erred and did not find substantial evidence to support the specification being straightforward and clear and not in any way inaccurate. Why is my reaction to this record wrong? With respect to the Delamination Claim, that is correct. The specification is very clear. It's a performance specification. It's a recipe for contractors to follow. With respect to the Airstart Claim, the speed of that, the specification, the language is a little more ambiguous. We'll get to that. So this is very clear. Not a little more. It's patently ambiguous, is it not? Okay. Well, it's hard to reconcile these drawings. What is it, C1 through 25 or something like that? And then the drawing D, which specifies what is to be done with respect to these Airstart devices. It seems to me, looking at all of those drawings, you have to say, well, there's some ambiguity. What am I supposed to remove or not remove? How much concrete to replace or not to replace? It seems to me that that would be something that a contractor would want to require. Yes. You're directing your attention to the Airstart Claim rather than to the Delamination Claim. Well, I thought you switched back. Okay. Well, let's proceed on the Airstart Claim to address that particular issue. This is a classic case of the patently ambiguous distinction. In all commercial contracting, the common law in federal contracts and throughout the states is that the drafter of the contract creates an ambiguity, and the other party has a reasonable interpretation for its reading of the contract. And there are other considerations as well. Typically, the party that drafted the language has that language construed against it. There's a carve-out for government contracts. There's an extra assist for the government spec writers, and that's called the ambiguity distinction. A key factor in that distinction is that in cases of unceasing standard, for example, the Maffei case asks the court to place itself in the shoes of the reasonable and prudent contractor and decide how such a contractor would act in an appellant situation. Furthermore, another consideration is that you are to take consideration, consider the state of a busy contractor and not get into Monday morning quarterbacking. In that case, once an ambiguity is perceived, in retrospect, if you focus on that ambiguity out of the context, it can seem to loom very large and look patent. What you need to do is to go back to these opinions suggest. Go back, put yourself into the shoes of a contractor in that situation. And the situation in this case had to do with 35 pages of the prints, all precisely identifying the areas of concrete that needed to be repaired, specifying which concrete was to be left alone, which was to have minor repairs, which was to have a full depth repair or partial depth repair. And in fact, at C10, there's a, this is at the A325, it's on one of the prints. This is C17, repair details. There's basically a warrant here that says, we will tell you, contractor, every place there needs to be concrete removed or replaced. It says, approximate location, note one, approximate location, length and width of each full depth repair are shown on BCC repair drawings, etc. And it was a very logical, comprehensive set of specifications. What the contract's office did when they, there was a prior solicitation that was canceled. They decided to change it a little bit. So they took the original set of prints that were stamped by an engineer, Art Billington, and they were labeled pages one through 35, one of 35, two of 35, and so forth. And they added a separate page, D1. And they changed the format of the table of contents in the beginning of sheet T1 to include this new page. And they changed the pagination. So it appeared, according to the testimony of the contractor, and I think looking at this, it appeared that this was an integrated set of plans. It looked integrated because of the changes made to the engineer's set by the government contracts department. And there was no warning that that last page, that last sheet, was inconsistent with the logic that flowed entirely into that point. Wouldn't you think, counsel, that an experienced contractor looking at that cover sheet that designates page T1, it's in boldface, it's got a different sort of title to it than the other pages do, and then the last page itself has a different design block on it, and it doesn't, they don't look alike. It doesn't look like all the rest of the pages do. Well, in retrospect, when we go through the microscope, there are differences such as you pointed out. Even my little eyes can detect that in the microscope. And the last page was denominated an air start demolition, and the table of contents of it was called. There were mechanical drawings on that page, T1, all having to do with the mechanics of removing these physical units from the tarmac. And it also involved getting rid of the utilities, drilling down,  distributing the concrete base, which needed to be repaired. So the primary point of the last print was removing those utilities above the ground, and these utilities also sat on a smaller slab that had to be removed. As we went through the analysis for note 7 of D1, the first six notes in that lower left-hand block had to do solely with tying off the utilities, the pipes, the air power, and so forth. And then 7 through 9 had to do with, as our client interpreted it, had to do with fixing the damage being done by removing that utility. And note 7 had to do with removing that concrete slab upon which those eight air start units were resting. Note 7 also says nominal slab size 15 by 12 and a half. Does the record reflect what your client thought that meant? Yes, it does. Mr. Grant said he saw the word nominal, and to me, to him, it meant approximate. It's not a term that he came up with that often. And up to that point, he was looking for something that would say it's removed, that raised slab. And this was the first occasion. What was the actual measurement of the raised slab? It was about 7 and a half by less. So it was about half or so feet. He thought nominal meant half his feet? Well, it didn't strike him in the context and flow of the diagram. It didn't strike him that particular way. How did he read 9.9, which talks about install and compact base course to grade, compaction shown in accordance with contract specifications, install new Portland cement concrete slab in accordance with the contract specifications, matched thickness of adjacent slabs. There were no adjacent raised slabs. There were only adjacent slabs in the underlying base. And the underlying base is the underlying concrete is the only material that would rest on an installed and compacted base course. How did he interpret 9? Well, he testified and interpreted it as referring to the collateral damage. There would be a lot of drilling down through, taking chunks out of the underlying tarmac slab. So those chunks would have to be taken out. There would be some damage in the process in that language. And the damage could be on an overlap between two slabs. It could be anywhere within that. And when that is done, those instructions had to do with repairing it. What about in note 7 also, this comment just before the nominal slab size is 15 by 12 and a half feet, it says remove the concrete slab to extent of existing slab edges. So his interpretation is that that only meant the additional upper smaller piece of the underlying base. Yes, that was his interpretation. The context of that interpretation has to do with page C17, where there's that warranty that each full depth repair shown on these drawings will be identified with this legend system. And he got to page D1. The legend system, the markings weren't there. There was nothing consistent with the prior pages. And he was looking for something that would cause him to take, to remove that upper raised pattern. Why don't we hear from the government? May it please the court. The C and D drawings from the contract were clearly conflicted. And this is evidenced in part by Westar's initial response when the government informed Westar that the contract required the ASU slabs to be removed. Westar did not reply that it had interpreted the D drawing to require repair to the underlying slab resulting from removal of utilities. At page 1876 of the appendix, Westar's initial reply is, the concrete removal sheets and notations are in direct conflict with note 7 of the D drawing. This was in March 1997. The government agrees that there was a direct conflict between the D drawing, note 7, and its entirety, the statement of work for the contract, and the C drawings. It was a patent ambiguity raising a duty of inquiry on the part of Westar. Alternately, Westar contends its interpretation was reasonable because the contract warranted that all repair and replacement would be shown on the C drawings. However, this is contrary to Westar's own purported interpretation of the D drawing, which it contends it believed required it to remove concrete pads and make repairs to the underlying ASU slabs, which is concrete repair and replacement. Furthermore, even if the court found that the ambiguity was latent, Westar's interpretation just wasn't reasonable. Westar has offered no reasonable interpretation for the instruction that the nominal size of the slab to be removed, this is in note 7, is 12 1⁄2 by 15. The size of the pad that Westar contends it believed was the slab was 3 1⁄2 by 7. And there's testimony in the record from the government's expert that the standard size of all airport paving slabs is 12 1⁄2 by 15. That's the standard. In addition, the D drawing is not the only place that states that these slabs should be removed. It's in the statement of work for the contract. It says remove 64 Airstart units and Airstart unit PCC slabs. That was on the first page of the solicitation. Westar contends that it believed that note 9 required incidental repairs to the removal of the Airstart unit, but that's a tortured construction when the note specifically says install new Portland concrete cement slab in accordance with the contract specifications. There's no specifications regarding concrete pads in the contract. It's only concrete slabs. In addition, on the D drawing, there's a picture of the pads and they're labeled as pads, so it's clear that that's something different than the slabs. I think to address the duty of good faith and fair dealing extensively in our briefs, we don't believe that this is necessary for resolution of the case, but if the court has any questions about the arguments that we bring, I'd be happy to address them. Moving on to the delamination claim, the burden in the delamination claim is for petitioner to show that the specifications were defective. The burden is not for the government to show that the specifications were possible, and in fact, the government's expert, Mr. Miller, did testify that the specifications were possible to be performed without delamination if Westar followed the contract requirements regarding not allowing the bonding case to dry and other placement requirements. There's substantial evidence in the record that Westar, in fact, did not. Petitioner has raised many arguments that a government witness testified falsely. There's substantial evidence in the record supporting the board's finding that Mr. Cruz was a credible witness, and there's other corroborating evidence that his testimony was correct. One other thing I'd like to mention that petitioner raised in the reply brief, petitioner contends that the board did not specifically mention Westar's failure to meet the 45-minute placement requirement as a deficiency, and therefore, it can't be considered by the court. That's contrary to Propellix v. Brownlee, which states that the court can consider reasons not explicitly cited by the board in an affirmance. In addition, I'd like to point out, petitioner argues that the 45-minute placement requirement was waived in July 1999 by the contracting officer. In fact, that's true. However, the micro silica specification in the bonding course was removed by permission of the contracting officer in March of 1999. So simply because the contracting officer concluded that it wasn't necessary to meet the placement requirement without the micro silica is certainly not any sort of admission that it was not necessary to meet the micro silica placement, the 45-minute placement when the micro silica was in the contract. For these reasons and for the reasons cited in our brief, we respectfully request that the court affirm the board's decision. If there's any other questions, I'd be happy to answer them. All right. Thank you very much. I would like to address the burden of proof in this case. The burden of proof for a defective specification is not for the contractor necessarily to show that the specification is defective, but for the contractor to show that it performed according to the specification, according to the precise requirements set out in the specification. And here we have a section of the brief where we go through that for each of those paragraphs and cite it to the record, showing that they comply with each of the paragraphs. Then we have another section of the brief where we go through the four or five or six cited types of errors and then identify where in the record those errors are supported. And it turns out they're not supported. And I think a careful reading has required that to the record. We have an experimental specification, Mr. Miller, who counsel referred to, had never seen this used before. No one had ever seen it used in an airport tarmac or in a flat surface. It's a thin layer of micro silica upon which a repair layer of concrete would be overlaid. Nobody had any evidence that this could work. And so we don't have something that's routine that should work if you do it right. We all know it works if you do it right. It wasn't that situation. So Westar showed that it complied with the specification, paragraph by paragraph. We cite that. And then it addresses the errors. There were no witnesses in this phase one. There were 19 reports in phase one. There were no outside witnesses to what happened except for the May 16 memo by Mr. Cruz. So we have one witness who saw an error one out of 19 days. We don't have any evidence that there were errors committed. I think a careful view of the record shows that. One, going back to the Peyton ambiguity interpretation argument. This is a clause cited by Apelli. This is A57. It's the cover sheet for the solicitation award form, standard form 1442. And there's a description of work with a series of verbs. Under it, replacement. Repair of Portland cement concrete. Replacement of the slabs. And then down below it says- Okay. It is in the brief. Thank you very much. Thank you.